[Civ. No. 6274. First Appellate District, Division One.—March 26, 1928.]

J. Y. KURIHARA et al., Appellants, v. THE CITY MARKET OF LOS ANGELES, a Corporation, Respondent.

Meserve & Meserve and Timon E. Owens, for Appellants.

Anderson & Anderson and E. J. Fleming for Respondent.

PARKER, J., *pro tem.*—This is an appeal by plaintiffs from a judgment decreeing that plaintiffs are not entitled to a permanent injunction enjoining or restraining defendant from interfering with, removing, altering, taking away, or demolishing certain leased premises described in the complaint, or the building in which said leased premises are located.

While other issues were joined in the pleadings, at the trial the issue submitted centered about the construction of a certain lease between the parties. The sole question for determination is as to the power of the lessor under the provisions of the lease. The court below held that under the construed provisions the lessor did have the right and power to terminate the lease.

Preliminary to a discussion of the facts it may be noted again that all other questions have been laid aside, and both parties here are in accord on the proposition that a determination of the lessor's power to terminate the lease disposes of the appeal.

On August 1, 1924, the defendant corporation was the owner of a public market known as The City Market of

Los Angeles, which at that time extended from Ninth Street on the north to Eleventh Street on the south, a distance of nearly 1,000 feet, and from San Pedro Street on the east to San Julian Street on the west, a distance of nearly 300 feet, comprising what would have been two full city blocks if Tenth Street had been projected through the property. The entire area, however, was not covered by one building. We find in the transcript no map or diagram detailing the construction. However, a very general description will suffice. At the time of the execution of the lease here involved almost the entire outer portion of the land was built upon with frontages on each of the four streets named. There were passageways and openings from the street into the buildings and also between. The center of the area was without buildings, and in such space were provided delivery facilities to the various tenants.

As indicated, the City Market was a large enterprise. Many different dealers conducted business therein, each in a separate capacity, and the whole constituting a distributing center or market for general produce, groceries, meats and such articles as are generally classed as household necessities.

On August 1, 1924, a written lease was executed wherein City Market Company of Los Angeles was lessor and the appellants herein were lessees. The leased premises are described as ''certain stalls or store-rooms in the premises located at Ninth, Eleventh, San Pedro and San Julian streets in Los Angeles, commonly known and called The City Market premises.'' The stalls were Nos. 613, 615, 617 East Eleventh Street and were the middle section of an 80-foot building fronting on Eleventh Street. The lease contains the stipulation called paragraph 4 of the lease: ''(4) This lease is accepted by the lessees upon the distinct understanding, stipulation and agreement that the rules and regulations hereinafter set forth shall be considered a part of this lease, and as such shall during said term be in all things observed and performed by the lessees and their employees, servants and customers who may come to or into any part of said premises or buildings at the invitation of the lessees. Said rules and regulations are as follows, to wit: . . . '' Here follows a complete set of rules and regulations of the City Market of Los Angeles buildings, em-

bracing 28 separate paragraphs. Paragraph 24 of said regulations reads as follows: "The lessor contemplates making changes, openings, alterations, additions and improvements in and to the present market buildings, and in the event lessor should deem it necessary (and it shall be the sole judge thereof) to possess for any of the purposes aforesaid the premises hereby demised to lessees, it reserves the right, option and privilege to cancel this lease on sixty (60) days' written notice to lessees, and lessees accept said lease upon the understanding and agreement that this lease may be canceled by the serving of said notice."

On or about June 19, 1925, defendant corporation notified appellants, lessees, as follows: "You and each of you will please take notice that the undersigned corporation has elected to demolish that portion of the building that you now occupy under and by virtue of the provisions of the lease dated August 1st, 1924. Therefore you will please take notice that under paragraph 24 of said lease this corporation elects to and does hereby avail itself of the right, option and privilege in said lease to cancel said lease on sixty days' notice to you. In view of the above and foregoing election on our part, your said lease is hereby canceled, annulled and abrogated sixty (60) days from the date of the service of this notice upon you, and we hereby demand immediate possession of said premises on the expiration of said sixty days' notice."

It is conceded that there was no evidence of fraud, subterfuge, or unfair dealing on the part of defendant, or any attempt to make use of this clause in the lease purely for the purpose of ejecting plaintiffs. The evidence taken was slight as the controversy was one almost entirely of construction. However, the testimony showed that the determination of the lessor to demolish the premises occupied by plaintiffs was as of date April 9, 1925. Further, it does not appear from the testimony that all of the market center buildings are to be demolished. In fact, throughout the trial below and here the concrete question presented is stated thus: ■ "The sole question is, does clause 24 of the lease permit the termination thereof on sixty days' notice where the thing intended by the lessor to be done is the demolition of one of the buildings?" Appellants contend also that the right of termination as provided in

the lease was tied to changes, alterations, etc., which were in contemplation at the date of the execution of the lease, namely, August 1, 1924. This contention is not supported by any citation of authority nor is much argument made to support it. Appellants contend that the words "the lessor contemplates making changes, etc.," as used in the paragraph here in question restrict the right of changes then actually in contemplation. However, the entire paragraph indicates some future action, and as a matter of definition the word "contemplates" does embrace the future at least to the extent of being opposed to the thought of a fixed determination. The word "contemplate" is defined by Webster (International Dictionary) as follows: "To have in view as contingent or probable; to look forward to." It appears further from the record that at the time of the execution of the lease here the defendant owned other property south of Eleventh Street not then devoted to market purposes. At or about the time of notice of cancellation defendant had determined to construct and had constructed certain buildings on this property south of Eleventh Street. When the notice of cancellation was given it was stated therein that the reason for the destruction of the leased premises was that such leased building might not be considered an obstruction to the new building. Appellants argue, therefore, that the reason for destroying the market building under lease herein was to prevent it from being an obstruction to buildings erected long subsequent to the date of appellants' lease. The argument is not persuasive. The new buildings were erected in furtherance of the general building scheme of defendant with reference to market purposes. The site and such property as was contiguous thereto and owned by defendant continued as a market center and essentially interconnected in business design. The lease provided for "changes, alterations, improvements in and to the present market buildings." It seems clear to us that the construction of a market building on adjacent property, the whole to constitute the City Market, was at least an improvement to the existing buildings and an addition thereto. What follows hereafter will have equal application to this phase of the contention, and such citation of authority as may appear will likewise apply.

Coming now to what is the main contention, it may be repeated thus: "Does clause 24 of the lease permit the termination thereof on sixty days' notice where the thing intended by the lessor to be done is the demolition of one of the buildings?" Appellants carrying the negative contend that the language used precludes the idea of such power or right being reserved in the lessor. Adopting the language of appellants, they "submit that the five words 'changes, openings, alterations, additions and improvements' are not sufficiently broad to include the right to demolish the premises leased to appellants." The argument then proceeds with definitions of the separate words. It would be impossible to give all the varying shades of meaning that each word conveys.

The words of the contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given them by usage, in which the latter must be followed. (Civ. Code, sec. 1644.)

There is no apparent reason why a lease of real property should not be construed as any other contract pursuant to the code provisions, by the application of the prescribed tests. We must, therefore, look to the subject matter of the contract and the language of the parties in its ordinary signification in order to determine therefrom what was their intention, upon what proposition their minds actually met and to what they did consciously consent. (*Realty Rebuilding Co.* v. *Rea*, 184 Cal. 565, at p. 575 [194 Pac. 1024].)

The scope, purpose, and effect of the lease must be determined from a consideration of it as a whole rather than by resort to any individual clause thereof. Such construction should be placed upon it as will render all its clauses harmonious and consistent. So construed the lease must be given such an interpretation as will make it effective in conformity with the intention of the parties; and if its terms are in anywise ambiguous or uncertain it must be interpreted in the sense in which the lessee believed at the time of making it that the lessor understood it. Words and sentences should be construed to make sense and reason (*Lang* v. *Pacific Brewing Co.*, 44 Cal. App. 621 [187 Pac. 81]).

■ It is, of course, true that a lease should be given an interpretation which would work no obvious injustice to either party if the language used is susceptible to such interpretation (*O'Connor* v. *West Sacramento Co.*, 189 Cal. 24 [207 Pac. 527]).

The meaning of a lease is to be ascertained in the light of conditions existing when it was made (*C. M. Staub Shoe Co.* v. *Byrne*, 169 Cal. 122 [145 Pac. 1032]). See, also, 15 Cal. Jur. 625.

With these general principles in mind we may proceed with a construction of the lease in the case before us. However, without dispute certain facts are disclosed from the record and from the lease itself.

The Los Angeles City Market was an enterprise in itself covering two square blocks. The lease of plaintiffs was for a small portion thereof, namely, six stalls, to be used for the sale of fruit, produce, and farm products and for no other purpose. The lease itself indicates the intent of all of the parties thereto that the premises should be occupied and used in conformity with the general design of the premises and as a market unit rather than as separated therefrom. This is evidenced from the designation of the leased premises as being stalls in the City Market premises, and further from the fact that as a part of the lease the rules and regulations of the City Market were specifically included. The rent reserved was $144 per month. The lessees took possession of the premises mindful of the provisions of the lease whereby the same might be terminated. The lease was subject to termination upon sixty days' notice whenever the lessor might deem it necessary to possess the leased premises for the purpose of making changes, openings, alterations, additions, and improvements to the market buildings. Here it may be noted that the lease did not limit improvements or changes in that portion of the market demised to plaintiffs. Indeed, it would seem reasonable to infer that if alterations, additions, or improvements were intended to be made upon the particular portion leased, then it would have been unnecessary to provide for a termination of the lease or to make any provision therein other than one of temporary possession during the period of time necessary. Obviously, viewing the situation and use of the premises, all parties foresaw the probability of

changes and alterations and improvements, and had in mind that they might be of an extent that would require the termination of the lease. It seems apparent that neither of the parties considered that the effect of the provision was merely to permit the lessor to make usual and ordinary improvements and alterations inuring to the betterment of the particular stalls leased. Accepting the trial court's conclusion and the general theory of the case, there is no question of fraud or bad faith involved. The lessors, owners of adjoining property, decided to enlarge the City Market by new buildings on the said property, and in the working out of a general market scheme embracing the old structures concluded that the particular premises covered by plaintiffs' lease should be demolished. Under the provisions of the lease the necessity of this is to be determined solely by the lessor. Both appellants and respondents have presented various and varying definitions of all of the terms in dispute, namely, "changes," "openings," "alterations," "additions" and "improvements." Were we to follow these definitions we could needlessly extend the limits hereof beyond reason. We are satisfied that the erection of another group of buildings on adjacent property used in connection with the former buildings and all constituting one general market, was an improvement to the market buildings existing at the date of the lease. Likewise, it was an addition thereto, and it follows that a change was made. Therefore, the lessor was within the provisions of the lease as set forth in paragraph 24 hereinbefore noted.

It is not the policy of the law that one may unjustly enrich himself at the expense of another. To sustain the contention of appellants here would in effect amount to just that much. No especial equities are urged and no degree of injury anticipated by appellants. From the record here they stand squarely upon the proposition that though all else about them may be ruin and destruction, still the particular portion of the market premises under lease to them must stand and be maintained. They concede that defendant may decide to add a wing to the leased premises, may determine to alter the same to any extent not equal to demolition, and when this determination is reached the lessor may terminate the lease. We conclude, however, that the words used give the lessor a greater right and power

in the premises; and that in changing or improving the general market plan the lessor is not confined to the original buildings.

All other points were disposed of in the court below, and nothing but this one is urged here.

Judgment affirmed.

Tyler, P. J., and Knight, J., concurred.